## IN THE UNITED STATES DISTRICT COURT
## DISTRICT OF KANSAS

MELVIN HALE, PH.D.,

        *Plaintiff*

v.

EMPORIA STATE UNIVERSITY (ESU),
JACKIE VIETTI, PH.D.,
DAVID CORDLE, PH.D.,
JUDY ANDERSON,
KEVIN JOHNSON,
RAY LAUBER,
MIRAH DOW, PH.D.,
GARY WYATT, PH.D.,

        *Defendants*.

**Case No. 16-** 4183-DDC-KGG

## COMPLAINT

COMES NOW Plaintiff Melvin Hale, pro se, and alleges as follows for his cause of action against Defendants ESU, Vietti, Cordle, Anderson. Johnson, Lauber, Dow and Wyatt as follows:

### DESIGNATION OF PLACE OF TRIAL

Plaintiff hereby requests that the trial of this cause be held in Topeka, Kansas.

### JURISDICTION AND VENUE

1.  This action arises under the Constitution of the United States and the provisions of 42 U.S.C. § 1983 and Title VII. The jurisdiction of this court is invoked pursuant to 28 U.S.C. § 1331, and to 42 U.S.C. § 1983, and to Title VII, and to the First Amendment of the United States Constitution. This case is a re-filing of Case No. 15-CV-4947-SAC-KGS in this federal district (hereinafter referred to as "OC" original case) which was voluntarily dismissed without prejudice

upon the condition "that all pleadings, discovery, testimony, orders or rulings, or any other substantive matters from this case, will be binding in any later filed action of the same claims so as not to prejudice either party to this action, with costs to be borne by the party incurring it." OC, Doc. 93, pg. 6

2.  The Court has personal jurisdiction over Defendants because the unlawful acts and conduct complained of herein occurred within this Judicial District.

3.  All administrative prerequisites and conditions precedent have been met.

### THE PARTIES

4.  Plaintiff MELVIN HALE is currently a resident of Arizona.  His national origin is African American.  At the time relevant to the Complaint he was a resident of Emporia, Kansas, and held the position of Assistant Professor in the School of Library and Information Management (SLIM) at Emporia State University (ESU).  His employment was from July 2014 to May 2016.

5.  ESU is a state-supported institution of higher learning, with the main campus located in Emporia, Kansas, and it has a current enrollment of just under 6,000 students. Melvin Hale has received Right-To-Sue Letters from the Department of Justice to pursue Title VII claims against ESU.

6.  Defendant JACKIE VIETTI, PH.D. is the former Interim President of ESU. She is Caucasian.

7.  Defendant DAVID CORDLE, PH.D. is the Provost of ESU, and presides over all academic affairs at the university. He is Caucasian.

8.  Defendant JUDY ANDERSON is the Director of Human Relations at ESU.  She is Caucasian.

9.  Defendant KEVIN JOHNSON is the General Counsel of ESU, and the Co-Director of The Koch Center for Leadership and Ethics at ESU.  He is Caucasian.

10.  Defendant RAY LAUBER is an HR Specialist at ESU.  He is Caucasian.

11.  Defendant MIRAH DOW, PH.D. is a Faculty Chair, and current Interim Dean of SLIM and is currently under consideration for promotion to Dean of SLIM.  She is Caucasian.

12.  Defendant GARY WYATT, PH.D. is Dean of the Honors College, and Assistant Provost at ESU, and was for a period Interim Dean of SLIM. He is Caucasian.

13.  Defendants Vietti, Cordle, Anderson, Johnson, Lauber, Dow and Wyatt are all sued in their individual capacities for money damages.

14.  Defendants Vietti, Cordle, Anderson, Johnson, Lauber, Dow and Wyatt are all sued in their official capacities for injunctive relief.

15.  Defendants sued in their individual and official capacities were residents of the State of Kansas and employees of Emporia State University at the Emporia, Kansas, campus at all times relevant to the (TAC). These individual Defendants were acting in the course and scope of their employment, or as agents of ESU, when they took the actions set forth herein.

**FACTS COMMON TO ALL CLAIMS**

16.  Emporia State University ("ESU") hired Dr. Melvin Hale, as an Assistant Professor with the School of Library and Information Management ("SLIM") on July 1, 2014.

17.  Emporia State University ("ESU") hired Angelica Hale, Dr. Hale's spouse, as an Assistant to the Dean of SLIM for Marketing on July 1, 2014.

18.  In December 2014, Dr. Hale accused Debra Rittgers, Office Manager and Assistant to the Dean of SLIM, of a deliberate act of what he believed was racial discrimination directed towards his wife.  He reported that concern to Dean Alexander.

19.  Dr. Hale enumerated several instances of perceived discriminatory conduct by Rittgers directed at either he or his wife since they arrived in July 2014.

20.  Dean Alexander ridiculed Dr. Hale's allegations by stating that he and Angelica were probably too sensitive, and that Rittgers was not acting in a racially discriminatory manner as far as she was concerned.

21.  Dr. Alexander asked Dr. Hale if Angelica was going through menopause.

22.  From that point forward Dean Alexander began to defame Angelica and Dr. Hale to various faculty, staff and administrators.

23.  Alexander started a course of termination for Angelica Hale and Dr. Hale because she opposed their views on racial discrimination.

24.  That Dean Alexander, who is Caucasian, would debate with Dr. Hale or Angelica Hale, who are African American, about their feelings towards racialized acts, and not take them serious, is itself problematic.

25.  Dr. Hale informed Dean Alexander that Angelica would not return to work at SLIM unless certain conditions were met following this December incident.

26.  Dr. Hale requested that Angelica Hale be moved to a private office upstairs on the fourth floor, the top floor of the building, away from Rittgers.

27.  Dr. Hale believes that his complaints and the transfer of Angelica, a non-faculty contractor, upstairs to a prime location and the second largest office on the faculty floor, ultimately ignited the rage that resulted in the racial slur that was found in her graduate assistant's office, also on the fourth floor, on or about April 8, 2014.

28.  Angelica's fourth floor office happened to be directly across the hall from Dr. Hale.

29.  Both Angelica's office and Dr. Hale's offices were large in comparison to other offices on the fourth floor.

30.  On information and belief, this move upstairs created unspoken tensions in the workplace.

31.  After moving to the fourth floor, Dean Alexander described Rittgers as "territorial."

32.  Rittgers terminated all except necessary communications with Angelica after the move.

33.  Rittgers failed to have Angelica Hale's phone transferred upstairs for almost six months, although this was her responsibility.

34.  Rittgers interfered with Angelica Hale's assignments for her graduate assistant, and gave her conflicting assignments.

35.  Dr. Hale believes that Rittgers and the viewed him and his wife as non-conformists, so they consorted to offend the Hales in a show of defiance and power.

36.  Angelica Hale's graduate assistant, who is Caucasian, reported workplace hostilities as well.

5

37.  As African Americans, the Hales represented a threat to the racial lens at SLIM.

38.  On April 8, 2015, Angelica Hale's graduate assistant reported that when she arrived at work that her office door was "unlocked," that things were "tampered with," and that the word "NIGGAZ" was found written on the notepad on her desk.

39.  The graduate assistant, Brenda, was in shock that someone would do such a thing.

40.  The graduate assistant waited until Angelica came back from a meeting to specifically inform Angelica of the acts of hate speech and vandalism.

41.  The graduate assistant had plenty of opportunity to inform the Dean, who was present on that day, of the incident, but chose to inform her direct supervisor, Angelica.

42.  Dr. Hale believes that the act of vandalizing the student's notebook with a racial slur was directed at he and Angelica for their boldness, which is uncommon at ESU, and that her assistant was merely a conduit for that message.

43.  ESU fosters a white-dominated culture that does not appear to feel the need to diversify, starting from the top down.

44.  Despite the fact that ESU over 150 years old in the 2014-2015 academic school year, it did not have even one tenured African American professor, and only one African American male tenure-track faculty, Dr. Hale.

45.  The entire senior administration at ESU lacks Americans of African descent and at the time of the incident was entirely of Caucasian decent.

46.  On information and belief, Dean Alexander and Debra Rittgers are close personal friends outside of the office.

47.   Dr. Hale believes that Dean Alexander commenced her hostile and retaliatory actions in response to his accusations of racism against her good friend and right-hand assistant, Debra Rittgers.

48.   Dean Alexander is on record, literally recorded, stating to Dr. Hale that he should expect racist conduct because "This is Kansas."

49.   It became apparent that Dean Alexander did not plan to do anything about the racist message or vandalism of the graduate student's office.

50.   Dean Alexander stated that ESU did not have a coherent policy on what to do in a situation like the one reported on April 8, 2015.

51.   Dean Alexander ridiculed the notion of racism and disparaged the Hales.

52.   Dean Alexander's stance became the official stance of ESU and ultimately all the Defendants towards Angelica and her husband.

53.   In April 2015, after Angelica and Dr. Hale made a request to Dean Alexander to investigate the bias incident, Dr. Hale also informed SLIM Faculty Chair Dr. Dow about the incident, a few days later, and asked her to investigate why nothing apparently was being done.

54.   Subsequently, Angelica Hale confided with Dr. Dow her concerns about the incident and the manner in which it was addressed.

55. Dr. Dow stated that she was amazed that Dean Alexander had done nothing about the incident after about a month after it occurred, and agreed to speak to Dean Alexander and Human Resources about it.

56.   In May 2015, Angelica Hale came to believe that the handwriting found in the graduate student's notepad was similar to the distinctive style of Defendant Rittgers, so she sent

samples of Rittger's handwriting to forensic handwriting examiner Wendy Carlson, along with a high-resolution digital photograph of the slur, unbeknownst to Dr. Hale.

57.  Carlson concluded that Defendant Rittgers was the most probable author of the slur, assigning her level of confidence at eight on a nine-point scale.

58.  In late June 2015, Angelica and Dr. Hale reported the bias incident to the ESU Provost David Cordle and to the Director of Human Resources Judy Anderson.

59.  After meeting with Dr. Cordle and Judy Anderson, the Hales went to the ESU Police Department and attempted to file a crime report.

60.  The ESU Police Department was shown the handwriting and was provided with the opinion of handwriting examiner Carlson, and was asked to follow up with her.

61.  ESU Police Department Chief, Chris Hoover, refused to investigate the matter, and immediately took the position that no crime had occurred, stating that ESU offices were public property and had open access. He refused to call the actions vandalism or hate speech or anything related to a hate crime.

62.  ESU Police Chief Chris Hoover dismissed the Hales' account of the bias incident as if he already had an opinion about it and would not change it; and he did not send anyone to physically investigate the scene.

63.  Dr. Hale then called the office of Lyon County Attorney, Marc Goodman, and left a message for Goodman to contact him regarding a possible hate crime at ESU.

64.  Goodman never returned Dr. Hale's phone call, but relying on information relayed by ESU, did not investigate the scene nor collect any evidence, but made the judgment call that "no crime had occurred."

65.  Dr. Hale sent a letter to ESU Interim President Jackie Vietti and asked her to look into the situation, and informed her that it appeared that he and Angelica were the victims of retaliation.

66.  Shortly after this Ray Lauber of Human Resources contacted the Hales and stated that he was doing a private report on the bias incident for Dr. Vietti.

67.  Lauber stated to the Hales, and to Dr. Dow, that his report was for Dr. Vietti's eyes only, and that this report was not a formal investigation.

68.  Angelica and Dr. Hale met with Lauber separately, and relayed their concerns about the April 2015 bias incident, and about previous incidents involving Rittgers.

69.  Dr. Hale referenced the opinion of Carlson to Lauber regarding Rittgers as a suspect.

70.  The Hales were subsequently informed by an employee of ESU that Ray Lauber was babysat by Rittgers when Rittgers worked with Lauber's mother in the Alumni Center.

71.  When confronted by Dr. Hale with this information, Lauber admitted the relationship of his family to Rittgers, but denied knowledge that she ever babysat him, and professed to be impartial. Lauber copied Vietti and Cordle on his answer to Dr. Hale about Rittgers.

72.  Dr. Hale informed Lauber, Vietti, Cordle and ESU General Counsel Kevin Johnson that he did not believe that Lauber could be impartial, and that he should recuse himself from the investigation.

73.  Vietti refused to remove Lauber from proceeding with the report, neither would Lauber recuse himself.

74.  After reporting the hate incident to the Provost and the ESU Police, Dean Alexander began to treat the Hales differently than others in the department.

75.  On July 7, 2015, Alexander visited the entire faculty on the fourth floor, but refused to visit the Hales.

76.  Dr. Hale and Angelica discussed this and decided that Dr. Hale should go and talk to the Dean.

77.  Shortly after the Dean left the fourth floor, Dr. Hale went down to the third floor to the Dean's office, and asked her about how things were going.

78.  Dr. Hale legally recorded his meeting with the Dean on his Samsung Galaxy 4 smartphone.

79.  Dean Alexander commenced a rant about how disappointed she was that the Hales had taken their concerns about the hate incident to the Provost and the Police Department.

80.  The Dean admitted that the performance of the Hales was stellar leading up to that point, and that she was "blindsided" by allegations of misconduct direct towards her and Rittgers.

81.  At one point the Dean stated that she had hoped that Dr. Hale would have overlooked the hate incident and issues of racism because he could have been a model for showing others how African-Americans are professional.

82.  Instead, she expressed frustration and outright anger at Hales' insistence that something be done about the hate incident and said he should understand because "This is Kansas."

83.  Dr. Hale mentioned that Rittgers was a suspect in the writing of the slur, and that she was "getting away with too much."

84.  The Dean responded that she did not consider Carlson to be handwriting expert, just a person with no integrity that anyone could find on the Internet and use for whatever purposes.

85.   Dean Alexander did not contact the graduate student the day of the incident, as she was asked to do by the Hales.

86.   Dean Alexander did not contact the graduate student the following day either.

87.   The Provost relayed to the Hales that the Dean told him she contacted the student the day of, or the day after, the hate incident.

88.   The student is on record stating that the Dean did not contact her until sometime in June 2015, after the Hales had brought the matter to the attention of the Provost.

89.   Angelica worked on a contractual basis during her first year at SLIM, but had been promised by the Dean that she would be made permanent because of the excellent job she was doing.

90.   Because Angelica had taken almost four years of college but had never finished her Bachelor's degree, the Dean wanted her to complete her degree while she worked as permanent employee. That would permit her to make a higher salary and have a more upwardly mobile career at ESU.

91.   In the early months of her tenure working for the Dean, Angelica was asked to provide a resume and other materials that the Dean would use to structure a permanent position for her.

92.   Angelica enrolled in classes at ESU starting in the fall of 2015.

93.   After the reporting of the hate incident to the Provost and the Police Department, the Dean made an abrupt about face, and after numerous queries from Angelica, informed her that her contract would not be renewed in July 2015, neither would she be made permanent.

94. Knowing that she had been lied to and that a heinous incident of hate was going to go unpunished, Angelica wrote an Open Letter to Dean Alexander regarding her feelings on the matter and resigned two weeks before her contract ended.

95. Angelica resigned because Dean had asked her to interface with Rittgers in a demeaning and subservient manner.

96. Angelica and Dr. Hale made it clear to Provost Cordle and Interim President Vietti, before Angelica resigned, that Dean Alexander was treating them differently after their report of a bias incident and discrimination, and that her actions amounted to retaliation.

97. Cordle and Vietti turned a deaf ear to Angelica's and Dr. Hale's complaints about racial discrimination and retaliation for reporting the same.

98. By allowing Dean Alexander to terminate Angelica's contract, ESU and the defendants effectively prevented her from discussing and making allegations of discrimination while employed at ESU.

99. The Open Letter that Angelica Hale sent to Dean Alexander created a firestorm of controversy on the ESU campus.

100. The controversy gained national attention when the Associated Press out of Kansas City, Missouri featured it as a Big Story on the AP wire on July 29, 2015.

101. Dr. Hale demanded that the bias incident be properly investigated, and that ESU adhere to the tenets of the Clery Act.

102. ESU and the defendants told the media and the campus on numerous occasions that ESU would make a fair, logical and thorough "investigation" of the bias incident allegations.

103. Beginning on September 9, 2015, and on multiple occasions thereafter, Defendants Vietti, Cordle, Wyatt, Anderson, Johnson, and Lauber announced to the media, campus and

public that as a result of a "fair, logical and thorough investigation" they concluded that no crime had occurred.

104.  Dr. Mirah Dow secretly offered a different opinion.  On August 17, 2015 she stated to Dr. Hale that "When I heard Jackie [Vietti] say 'there are going to be recommendations,' I thought, I kind of viewed that optimistically.  Because, while she might not say 'there was a crime,' I wish she would."

105.  Dr. Dow also stated to Dr. Hale that "You and Angelica both went about [reporting the bias incident] in a very prudent way.  It was responsible yet it wasn't flamboyant or unreasonable.  You know, you tried to solve it."

106.  Instead, Drs. Vietti and Johnson specifically stated that there was no racism or discrimination at SLIM, and "no hate crime occurred."

107.  Dr. Johnson denied the very possibility of a hate crime in Kansas, and provided a rationale that was purely a recitation of federal hate crime statutes pointing to sentencing guidelines.

108.  According to the rationale articulated by Dr. Johnson, murder by lynching would not be considered a hate crime in Kansas, because in his words, "There's nothing there," because there are no hate crime laws in Kansas.  So that's that.  Dr. Johnson literally took these positions.

109.  In a complete reversal of tone, Dr. Vietti made the following statement in an email to the campus and the press on September 10: "While the university concluded that no hate crime occurred, I want to make it clear that the university is not hiding behind the legal definition of a hate crime."  You can't have it both ways.

110.  In an interview with KVOE, Johnson stated that there were *no circumstances* under which the writing of the word "NIGGAZ" (or any word) on a "piece of paper" could be a crime.

13

111.  ESU deliberately lied about almost all aspects of the bias incident, and the "investigation" was nothing more than a frontal *ad hominem* attack on Dr. and Mrs. Hale.

112.  On September 9, after Dr. Vietti announced to Dr. Hale in a meeting that ESU had refuted the reports of a "hate crime," she shoved a document across the table to Dr. Hale and demanded that he immediately sign it, or he would not have a future with ESU.

113.  The letter indicated that Dr. Hale was to seek counseling and to refrain from discussing his concerns about discrimination in SLIM.

114.  Dr. Hale, accompanied by counsel at that meeting, was advised not to sign anything.

115.  Counsel told Vietti that to sign such a document would send a chilling effect to employees who reported hate crimes.

116.  Drs. Vietti and Johnson made it clear that they were not going to acknowledge or accept the opinion of handwriting expert Carlson, submitted to them by the Hale's attorney.

117.  Despite statements by Drs. Vietti and Johnson that there was insufficient handwriting to analyze, Carlson determined that there *was* sufficient handwriting information upon which to conduct a forensic handwriting examination, and to render an expert opinion.

118.  Defendants declared that "no crime had occurred" almost as soon as Dr. Hale and his wife reported it, long before any investigation was done.

119.  The "investigation" was limited to answering two closed-end questions, and one open-ended question: 1) Was a hate crime committed on or around April 8th, 2015?, 2) Did racial discrimination occur during the 2014-15 academic year?, and 3) Are there further observations or recommendations to be made for SLIM?

120. Instead of investigating the bias incident, ESU conflated the report of a crime with a "personnel matter," although Dr. Hale had not reported a personnel matter, and spent most of its time addressing purported "personnel matters."

121. On information and belief, Defendants concocted false narratives about the hate speech act that occurred in Office 413 where the racial slur was found in order to mislead and decontextualize and decriminalize the writing of the slur by Defendant Rittgers.

122. Defendants Alexander, Vietti, Johnson and Lauber began calling the private office an unlocked "non-office" in an open area where people came and went throughout the day and evening.

123. Dr. Hale believes that three minor crimes occurred when the act was done in the private office: unlawful entry, vandalism and hate speech.

124. Rittgers and Defendants Vietti, Johnson and Lauber claims that Rittgers had permission to use her master keys to enter the graduate student's office, but entry into any area with the intent to commit an act of vandalism, hate speech and retaliation is not lawful entry.

125. Defacing another's property without permission is considered vandalism.

126. Dr. Hale understands that these acts by themselves may not rise to the level of felonies, but not all crimes are felonies.

127. Dr. Hale and Angelica Hale attended the *2015 U.S. Attorney's Kansas Hate Crimes Symposium* hosted by U.S. Attorney Barry R. Grissom held on November 4, 2015 in Kansas City, Kansas, where it was confirmed that hate speech is on the spectrum of hate crimes.  OC Doc. 13, pg. 23

128. Defendants cannot categorically state that Rittgers is innocent, or lawfully exonerate her without violating the civil rights of Dr. Hale by treating him differently.

129.  Dr. Vietti stated that she met with Defendant Rittgers on more than one occasion during the "investigation" to obtain her point of view.  OC Doc. 13, pg. 41

130.  Dr. Vietti proclaimed that she was open to hearing all voices, but she steadfastly refused to meet with Dr. Hale or Angelica Hale to hear their voices during the "investigation."

131.  Defendant Vietti introduced the subject of Dr. Hale's termination at the same meeting in which she announced the results of their "investigation," so their investigation included illegally beginning a course of termination of Dr. Hale, without due process.

132.  A day after the march (OC Doc. 17-1, pg. 7), ESU followed up this initial letter to Dr. Hale with a second letter on September 16th, 2015, which added the requirement that Dr. Hale retract his allegation that Debra Rittgers was the most probable author of the racial slur, or face termination. OC Doc. 13, pg. 51

133.  In both letters, Dr. Hale was coerced to agree to false admissions.

134.  On or about September 17th, 2015, Dr. Vietti met with faculty, the media, boards of the BSU and other student organizations, and later with their rank and file members.

135.  After these meetings, at which Dr. Hale was excluded, almost the entire ESU campus, from faculty to students, ceased communication with Dr. Hale and his wife.

136.  On information and belief, ESU offered various and sundry incentives and promotions to students and employees to adopt and support their false story that no crime occurred.

137.  ESU's false narratives, published in the local and national media, resulted in a firestorm of criticism and hate speech against Dr. Hale and his wife, whose names were added to a 'hate-hoax' list frequented by advocates of racial hatred on the Internet.  OC Doc. 13, pgs. 72-90

138.  The ESU student newspaper The Bulletin referred to Dr. and Mrs. Hale as *People Who Cry Wolf*," and in various editorials The Bulletin slammed the Hales for suggesting that racism existed at ESU, despite years of such claims by previous staff and faculty, many of whom were minorities.  OC Doc. 13, pg.54

139.  An investigation which amounts to little more than "going through the motions" to justify a foregone conclusion does not pass the due process requirement of impartiality and procedural fairness.

140.  Lauber's "investigation" ignored and/or disparaged forensic evidence, and allowed critical relevant evidence, such as the student's notepad, to disappear.

141.  Defendant Johnson claimed that there was no crime whatsoever associated with writing a word, any word, regardless of the circumstances.

142.  Dr. Vietti stated that the writing of the slur was "reprehensible," but stated that any suggestion that Defendant Rittgers wrote the slur was "intolerable."  OC Doc. 13, pg. 41

143.  ESU publicly exonerated the sole suspect, defendant Rittgers.  OC Doc. 13, pg. 41

144.  In the 2014-2015 academic year, ESU was involved in two re-accreditations, one by the Higher Learning Commission (HLC) affecting the entire campus, and the other by the American Library Association (ALA), affecting SLIM.

145.  On information and belief, the Defendants were desperate to portray ESU as blameless and a model campus during this time of heightened scrutiny.

146.  On information and belief, Dean Alexander settled on a strategy whereby she would "retire" in order to "buy" political shield for Rittgers, ESU and SLIM.

147.  Dean Alexander was appointed Interim Provost at ESU in the 2012 to 2013 academic year, and she often bragged that during that time she obtained extensive political capital by terminating numerous undesirables for the President at ESU.

148.  Dean Alexander stated that she "took one for the University," which was interpreted to mean that she expected the University to back her positions on whatever she did.

149.  Dean Alexander presented herself as politically untouchable and invincible.

150.  On information and belief, Dean Alexander used her political capital to shield Rittgers and SLIM.

151.  ESU and the Defendants hoped that threatening Dr. Hale's job would induce him to retract his stated belief in Rittgers as the author of the slur, although it was based on forensic science.

152.  The ESU student paper, the Bulletin, published an article regarding this predicament on October 1st, 2015 entitled *Hale Must Retract or Face the Axe*.  OC Doc. 13, pg. 47

153.  Dr. Hale believes that his treatment was intended to have a chilling effect on future whistle-blowers inclined to expose racism at ESU.

154.  Defendants' "investigation" was not an investigation at all, but rather an attempted destruction of Dr. Hale's credibility and character.

155.  The very selection of Ray Lauber can be interpreted as an affront to Dr. Hale, Angelica Hale, and her graduate assistant, because Defendants knew Lauber had a longtime involvement with the suspect.

156.  Provost Cordle and Defendants Vietti, Johnson, Anderson, Wyatt and Lauber developed and extended a "Cooling Off Period" to deprive Dr. Hale from discussing Title VII discrimination, in direct violation of his First and Fourteenth Amendment rights.

157.  Defendant ESU sought to deprive Dr. Hale from obtaining potentially incriminating evidence.

158.  Dr. Hale's student and professional evaluations before the "Cooling Off Period" were excellent.  OC Doc. 17-1, pgs. 34 & 61

159.  Dr. Hale's student evaluations after he was excluded from SLIM were mixed.

160.  Dr. Hale was unable to access his office during the "Cooling Off Period," and he was unable to create a portfolio for review of his research and service contributions, which was used as the basis for termination, and ESU wants to blame Dr. Hale for this.

161.  The exclusion of Dr. Hale from his colleagues and the support services of the department, particularly for new faculty goes against University policy.  The ESU Policy Manual specifies that suspension of a faculty member during a grievance proceeding is justified only if "immediate harm to the faculty member or others is threatened by continuance of service."

162.  ESU instituted a program called the University Diversity Initiative (UDI) as a direct result of Dr. Hales protest against racism, but Dr. Hale did not benefit.

163.  ESU's UDI is but another example of retaliation under the pretense of reformation, used as part of their cover-up to divert, flaunt and promote former supporters of the Hales.

164.   A news story about a UDI meeting held on December 4th did not mention the fact that the Hales' actions sparked the efforts to have a UDI at ESU.  OC Doc. 17-1, pg. 51

165.  Dr. Hale has direct evidence that ESU offered incentives to students to attend their second diversity summit meetings after the first meeting had dismal attendance.

166.  The accreditation report of SLIM by the American Library Association (ALA), and approved by Karen O'Brien of the ALA showed evidence of significant bias against Dr. Hale.

167.  The ALA accepted the University investigation despite being provided significant direct primary evidence of egregious conduct at SLIM for months.

168.  In spite of a record which included not one but two federal lawsuits, an unacceptably high faculty turnover rate, complaints, and a Dean which had to be removed from regular duties, the ALA went beyond the bounds of their own standards to re-accredit SLIM in a manner that raises significant concerns about their integrity and their accreditation process.

169.  In the same year in which the SLIM program was under review by the ALA, which currently occurs every seven years, Interim Dean Dr. Mirah Dow from SLIM was appointed by ALA President Sari Feldman to serve on the ALA Task Force on the Context of Future Accreditation on October 30th, 2015.  OC Doc. 17-1, pg. 53

170.  The appointment of Dow was announced in the midst of SLIM's own accreditation period, which wasn't completed until January 2016, which sends the wrong message ethically.

171.  Each member of the accreditation team that visited SLIM was a white female, indicative of the racial insensitivity and tone-deafness at the ALA.

172.  Dr. Hale believes the ALA made a significant contribution towards his defamation, and against the cause of social justice, by giving its unreserved blessings to a program that many in the library and academic communities felt deserved to receive conditional status.

173.  At the same time that ESU began to publicly promulgate the narrative that a hate crime did not occur, people rapidly began to withdraw their support from Dr. Hale.

174.   On Information and belief, Jason Brooks, the newly appointed Assistant Dean of Student Affairs for Diversity, Equity and Inclusion at ESU was promoted from his former role as Director of Diversity and Inclusion at ESU as an incentive to abandoning the Hales' cause.

175.   On information and belief, Interim President Vietti is one of Brooks' professors in his doctoral program at Baker University, placing Vietti in a position of undue influence.

176.   At the onset, the BSU was very involved in protesting racism. OC Doc. 17-1, pg. 5

177.   BSU Vice President Deidra Elijah sent an email to Dr. Vietti in which she stated: "I think it is truly sad that the University continues to sweep racial issues under the rug." OC Doc. 17-1, pg. 15

178.   A supportive message to the Hales posted on Deidra Elijah's Facebook said: "As the Black Student Union Vice President, we will do any and everything in our power to support!!!" OC Doc. 17-1, pg. 17

179.   Shortly after Dr. Vietti conducted her series of meetings with faculty, staff and students of color from organizations like the BSU, and students like Deidra Elijah, Emmanuel Cockrell, Ceanna Trice, Kayla Gilmore, Tyia Everidge, Derek Wilson, student advisor Javier Gonzalez, Froilan Huachaca, Katelyn Ferrari, and most ESU students previously involved with the protest marches, abruptly stopped communicating with the Hales.  The second march was lightly attended. OC Doc. 17-1, pg. 13)

180.   Black adjunct professor Douglass Smith supported Dr. Hale up until the first march, even signing the letter sent to Interim President Vietti by black faculty and staff at the onset of the controversy (Doc 13, pg.63), but then stopped supporting  after the first march.

181.   Recently Dr. Douglass Smith sent Dr. Hale an email asking not to be contacted again. OC Doc. 17-1, pg. 19

182.   The President of the ESU Black Student Union, Emmanuel Cockrell, worked as an assistant to Interim President Vietti and is possibly still working as an assistant to the new President Allison Garrett.

183.   Dr. Hale mentioned this conflict of interest to Brooks and to Cockrell.  In the event the ESU BSU felt the need to protest administration policies, such a relationship could present complications to civil rights and freedom of speech, and is problematic.

184.   Dr. Hale stands by his assertion that he has been terminated. OC Doc. 13, pg. 95

185.   The ESU college paper, The Bulletin, printed an article that states that Plaintiff is a *former employee*. OC Doc. 17-1, pg. 56

186.   The same Bulletin issue goes on to falsely attributing a comment to him which was intended to inflame hatred towards Dr. Hale by ESU students, faculty, alumni, etc.

187.   The Bulletin story contained a header written in large letters that is supposed to be a transcript of an interview with Dr. Hale by reporter Sarah Spoon which claims that Dr. Hale stated:  "I don't feel safe in a town where, as a black person, I can see a Confederate flag fly on the main student's tower."  This refers to the main student dormitory. This statement is patently false and inflammatory.

188.   What Dr. Hale actually said was:  "I don't feel safe in a town as a black person when I can see the Confederate flag flying on the main street of the town almost any month of the year. That's not where I came from and that's not what I expected."

189.   Dr. Hale pointed out Sarah Spoon's error, along with other egregious errors in that transcript in the Bulletin to Ariel Cooley, Editor-in-Chief, and even shared his recording of the interview, but the Bulletin refused to correct their false statements to mitigate any reputational harm they may have caused Dr. Hale.

190.  Sarah Spoon accompanied Angelica Hale to the fourth floor of the SLIM offices in October 2015, and observed and agreed that Office 413 is a private office (OC Doc. 17-1, pg. 21). Spoon stated that she had been misled by statements made by Drs. Vietti and Johnson that described a different location called the Library Commons which was open 24 hours a day.

191.  Numerous reports in the Bulletin were nothing less than malicious, and the main reporter has become friends with the daughter of the suspect.

192.  Mirah Dow told Hale that ESU was looking for any excuse to terminate him.

193.  Mirah Dow told Hale that ESU had no qualms about playing dirty and creating a pretext, because "they've got a lot to lose." "That's the game here."

194.  Dow claimed that Gwen Alexander did not want to hear anything more about doing something about the bias incident before the matter became public knowledge.

195.  Dow stated that Hale should be careful not to raise his voice or even sound tense because "they're looking for anything they can."

196.   Dow stated that ESU had done the same things to many others before him, and that they were not above punishing her if she disagreed with what they were doing to Hale.

197.  Dow stated that she was concerned and afraid of ESU administrators retaliating against her, and that she was afraid of losing "power."

198.  Students in SLIM were told not to contact Hale for a reference during the "cooling off period."

199.  Ray Lauber, the internal investigator, gave instructions to Mirah Dow not to talk to Dr. Hale during the "cooling off period." OC Doc. 56, Pg. 37

200.  Hale could not contact anyone in SLIM to his discuss Title VII claims of discrimination during the cooling off period or the extended cooling off period.

201.  Hale was prevented from meeting with the American Library Association's (ALA) External Review Panel (ERP) for accreditation.

202.  SLIM faculty members were allowed state their opinions about SLIM and the program to the ERP while Hale was ignored.

203.  Jordan Heguy, a strong student supporter of Hale in SLIM was screamed at by SLIM Regional Director David Willis for speaking out against racism at SLIM, and posting her views on the ESU (Student Chapter of the ALA) SCALA page, although she was an officer in SCALA.

204.   Hale was removed at the last minute from teaching a face-to-face LI801 Foundations of Library and Information Management class in Portland.

205.  The adjunct professor to whom Hale's LI801 class was re-assigned, Ashley Todd-Diaz, had never taught the 801 class, and Mirah Dow stated that it was "impossible" for her to teach that foundational class as Hale would have done, and that she offered her opinion to Dean Alexander, who rebuffed her in a high-handed manner.

206.  Hale was prevented from saying anything about the upcoming march against racism in ESU in the faculty meeting on August 26, 2015, and two days later ESU instituted the permanent SLIM "cooling off period".

207.  SLIM Associate Dean Andrew Smith called Hale's attempt to say something about the September 15, 2015 march against racism in the August 26, 2015 faculty meeting "inappropriate," and was supported in that by Dean Alexander.

208.  Faculty and staff in SLIM were explicitly instructed by Dean Alexander not to discuss the march or the Title VII issues raised by Hale, and to accept the (false) results of the internal investigation.

209.    Hale sent Alexander an email in which he questioned her hostile behavior in the August 26 faculty meeting, and stated that their prohibition to discussing the march and sharing letters of support was a prohibition on free speech.

210.   Alexander instructed SLIM faculty to critically analyze Hale's claims (meaning disbelieve them), and to accept the official results of the "investigation" when they were published.  She said "Use your critical thinking skills to realize that this is not based on fact!" when in fact, everything Hale said was accurate, and the results of the internal "investigation" were a whitewash and a cover-up.

211.   The following day, August 27, Alexander and Smith angrily shut Hale down in Alexander's office for wanting to discuss the issues raised in the faculty meeting.

212.   Alexander asked Hale to open her office door on August 27, making their dispute public.

213.   Vietti and Johnson portrayed Brenda, the graduate assistant in whose office the racial slur was found, as having no work-related connection to Angelica Hale whatsoever**.**

214.   Vietti and Johnson, in their September press conference in which they announced the results of their "investigation" informed the press that Hale took advantage of a situation that only came to him and his wife's attention as a *fluke*, claiming that if Dean Alexander was present the day of the bias incident that Brenda would have sought out the Dean.

215.   Dean Alexander *was* on site that day, and Vietti and Johnson were abject liars on a number of important details.

216.   Johnson claimed that Angelica's office and her graduate assistant's office were on the third floor near the Dean's office, when, as stated earlier, both of their offices were on the fourth floor.

217.  As proof that Angelica was Brenda's direct supervisor, Alexander asked her to do Brenda's performance evaluation at the end of the semester.

218.  A separation agreement presented to Hale by Cordle and Johnson on October 12, 2015 contained a clause prohibiting Hale from filing any complaints, which Hale interpreted as including Title VII or EEOC complaints, as a condition of continued employment, in direct violation of Title VII law.

219.  Throughout this ordeal, Hale was professional. On August 12, 2015 Hale's colleague, Asst. Professor Sarah Sutton, stated in an email that "I really appreciate how gracefully you've handled the whole situation. I greatly appreciate that and respect you for it."

220.  Describing how Hale had gone about getting the bias incident investigated, Dow stated that Hale was "prudent" and not "unreasonable."

221.  Dow stated: "I don't know of any two better people to come to SLIM than you and Angelica. And I mean I say that consistently, and almost using the same words every time on purpose. And I really mean it."

222.  On December 2, 2015, a federal agent from the Topeka office of the Federal Bureau of Investigation (FBI) paid a visit to the SLIM offices referenced in this TAC at the invitation of the Hales.

223.  The visit of the federal agent was the first by a law enforcement agency to the scene of the alleged bias incident.

224.  The agent defined the alleged actions in the writing of the slur as "hate speech."

225.  Dr. Hale introduced the federal agent to Drs. Cordle, Johnson, and Dow, and to SLIM Graduate Assistant Bridgid Reeves.

226.  Dr. Dow was Interim Dean at this time, and Dean Alexander was on paid leave.

227.   While the federal agent was at SLIM, Defendant Rittgers was observed hurrying out of the SLIM office building to her car parked next to the building, where she drove away mid-afternoon.

228.   The federal agent, Angelica Hale and Dr. Hale were present, and watched as Rittgers left the premises of ESU after it was announced that the agent was present.

229.   Defendant Rittgers left the building with Kathie Buckman, the Regional Director at SLIM, and Candace Kitselman, the business manager at SLIM.

230.   SLIM office staff made themselves unavailable for questioning by the federal agent, which is critically important in the case of Rittgers.

231.   On March 14, 2016, ESU posted a job announcement for Dr. Hale's position.

232.   ESU's and SLIM's unlawful termination has affected Dr. Hale's professional career negatively, causing him physical and mental stress as well as financial hardship.

233.   ESU's and SLIM's termination of Dr. Hale was illegal.

234.   Dr. Hale was subjected to extreme hostility and negative publicity, all with the full endorsement Interim President Vietti, Provost Cordle, Director of Human Resources Anderson, General Counsel Johnson, Human Resource Specialist Lauber, Interim SLIM Dean Dow and Associate Provost Wyatt.

235.   In an effort to clear his name and to present and preserve the facts, Dr. Hale was forced to write a book entitled: *Django Unchained and the March on Emporia State, Institutional Racism as Practiced on an Academic Plantation in Kansas*. The book went on sale in November 2016 and is available at www.MarchOnEmporia.com. Having to take this extraordinary step to clear his name Dr. Hale had to reveal intimate details of his thoughts and

life, and his life will never be the same after what he experienced at Emporia State University at the hands of the defendants.

### Count I – Individual Capacity 42 U.S.C. § 1983 First Amendment Retaliation Claim Against Defendants Vietti, Cordle, Anderson, Johnson, Lauber, Dow and Wyatt

236.  Defendants Vietti, Cordle, Anderson, Johnson, Lauber, Dow and Wyatt retaliated against Plaintiff Hale on the basis of his exercising his right to speak out against discrimination and racism, in violation of  42 U.S.C. § 1983.

237.  Defendants Vietti, Cordle, Anderson, Johnson, Lauber, Dow and Wyatt retaliated against Plaintiff Hale by placing him in a "cooling off period" that effectively banished him from his workplace and colleagues, a move that would chill a person of ordinary firmness for speaking out against discrimination, in violation of  42 U.S.C. § 1983, activities protected by the First Amendment.

238. The cooling off period, which began in late August 2015, was left in place until Dr. Hale was terminated in May 2016, and was primarily characterized by "repeated ignoring" of Dr. Hale. Repeated ignoring is an *explicit violation* of ESU's own Title VII policy, as stated in their Policies/Process Manual for both students and employees, which states as follows: "Examples of the conduct that is prohibited include, but are not limited to repeated ignoring or excluding of one's presence or existence in a University setting." OC, Doc. 56, pg. 35

239. Defendants Vietti, Cordle, Anderson, Johnson, Lauber, Dow and Wyatt acted under color of state law when they violated Plaintiff Hale's rights.

240.  Plaintiff Hale has been damaged by the illegal conduct of Defendants Vietti, Cordle, Anderson, Johnson, Lauber, Dow and Wyatt.

241.  Plaintiff Hale is entitled to pursue relief against Defendants Vietti, Cordle, Anderson, Johnson, Lauber, Dow and Wyatt under 42 U.S.C. § 1983 and the First Amendment.

WHEREFORE, Plaintiff Melvin Hale, Ph.D. prays that judgment be entered against Defendants Jackie Vietti, Ph.D., David Cordle Ph.D., Judy Anderson, Kevin Johnson, Ray Lauber, Mirah Dow, Ph.D., and Gary Wyatt Ph.D. for an amount in excess of $10,000,000.00, for punitive damages, compensatory damages, economic damages, for all remedies allowed by law including an award of attorney's fees and costs, and for such other and further relief as the Court may order.

### Count II—Title VII Claim against Defendant Emporia State University

242.  Defendant ESU employed Plaintiff Hale, who is a member of a protected class.

243.  Defendant ESU retaliated against Hale on the basis of his race and color.

244. The cooling off period, which began in late August 2015, was left in place until Dr. Hale was terminated in May 2016, and was primarily characterized by "repeated ignoring" of Dr. Hale. Repeated ignoring is an *explicit violation* of ESU's own sTitle VII policy, as stated in their Policies/Process Manual for both students and employees, which states as follows: "Examples of the conduct that is prohibited include, but are not limited to repeated ignoring or excluding of one's presence or existence in a University setting." OC, Doc. 56, pg. 35

245.  Plaintiff Hale engaged in activities protected by Title VII.

246.  Defendant ESU retaliated against Plaintiff Hale because he engaged in activities protected by Title VII.

247.  Plaintiff Hale has been damaged by Defendant ESU's illegal conduct.

248.  Plaintiff Hale is entitled to relief for Defendant ESU's illegal conduct.

WHEREFORE, Plaintiff Melvin Hale, Ph.D. prays that judgment be entered against Defendant Emporia State University for an amount in excess of $75,000.00, for punitive damages, compensatory damages, economic damages, for all remedies allowed by law including

an award of attorney's fees and costs, and for such other and further relief as the Court may order.

DATED:  December 8, 2016                              Respectfully submitted,


                                                     _____
                                                     /s/ Melvin Hale, Plaintiff *Pro Se*
                                                     P.O. Box 6176
                                                     Goodyear, AZ 85338
                                                     reefresh@yahoo.com
                                                     916-690-7927