**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

MELVIN HALE,

        **Plaintiff,**

vs.

                                        **Case No. 16-4183-DDC-KGG**

EMPORIA STATE UNIVERSITY,
JACKIE VIETTI,
DAVID CORDLE,
JUDY ANDERSON,
KEVIN JOHNSON,
RAY LAUBER,
MIRAH DOW, and
GARY WYATT,

        **Defendants.**

## MEMORANDUM AND ORDER

Plaintiff Melvin Hale brings this action pro se against defendants Emporia State University ("ESU") and seven individual defendants. He alleges that his former employer, ESU, retaliated against him by placing him on a "Cooling Off Period" and terminating his employment because he complained about racial discrimination. He asserts a Title VII retaliation claim against ESU. Plaintiff also alleges that the individuals he has sued retaliated against him after plaintiff exercised his right to speak out against discrimination and racism. He asserts a First Amendment retaliation claim under 42 U.S.C. § 1983 against these seven individuals.

Defendants have filed a Motion for Judgment on the Pleadings under Fed. R. Civ. P. 12(c). Doc. 21. Plaintiff has filed an Opposition to defendants' motion. Doc. 23. And, defendants have submitted a Reply. Doc. 24. After considering the parties' arguments, the court grants defendants' motion in part and denies it in part. The court grants defendants' motion against plaintiff's Title VII claim because it is time-barred. The court also grants defendants'

motion against plaintiff's official capacity claims under § 1983 asserted against the individual defendants.  The court denies the motion in all other respects.

## I.     Factual Background

The following facts are taken from plaintiff's Complaint (Doc. 1), accepted as true, and viewed in the light most favorable to him.  *See Ramirez v. Dep't of Corr.*, 222 F.3d 1238, 1240 (10th Cir. 2000).  The court also construes plaintiff's allegations liberally because he proceeds pro se.  *See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

Plaintiff is an African-American male.  ESU hired plaintiff as an Assistant Professor in the School of Library and Information Management ("SLIM") on July 1, 2014.  Also on July 1, 2014, ESU hired plaintiff's wife, Angelica Hale, as an Assistant to the Dean of the SLIM for Marketing.

In December 2014, plaintiff complained to Dr. Gwen Alexander, Dean of SLIM, about Debra Rittgers, Office Manager and Assistant to the Dean of SLIM.  Plaintiff accused Ms. Rittgers of committing an act of racial discrimination directed at his wife.  Plaintiff also described several instances of perceived discriminatory conduct by Ms. Rittgers directed at either him or his wife since they arrived at ESU.  Dr. Alexander did not believe plaintiff's claim.  Dr. Alexander told plaintiff that Ms. Rittgers never had discriminated against him or his wife based on their race.  Dr. Alexander also told plaintiff that he and his wife probably were too sensitive, and, and according to plaintiff's allegations, she asked if his wife was going through menopause.

Plaintiff told Dr. Alexander that his wife would not return to work at the SLIM unless ESU satisfied certain conditions, including moving his wife to a private office on the fourth floor of the building, away from Ms. Rittgers.  In response to this request, plaintiff's wife moved to

the second largest office on the fourth floor.  Plaintiff believes that his wife's move to the fourth floor office then created "unspoken tensions in the workplace."  Doc. 1 ¶ 30.

After this conversation, Dr. Alexander began to speak negatively about plaintiff and his wife to ESU faculty, staff, and administrators.  According to plaintiff, Dr. Alexander "started a course of termination for [plaintiff and his wife] because she opposed their views on racial discrimination."  *Id.* ¶ 23.  Dr. Alexander would debate plaintiff and his wife about their complaints of racial discrimination.  Dr. Alexander also did not take those complaints seriously.

After plaintiff's wife moved to the fourth floor office, Ms. Rittgers stopped communicating with her unless necessary.  Ms. Rittgers also failed to transfer his wife's phone to her new office for almost six months.  And, Ms. Rittgers interfered with his wife's assignments to a graduate assistant by giving the graduate assistant assignments that conflicted with his wife's assignments.

On April 8, 2015, the graduate assistant arrived at work to find that someone had unlocked her office, tampered with its contents, and wrote the word "NIGGAZ" on a notepad on her desk.  The graduate assistant reported what she found to Ms. Hale.  Plaintiff believes that the racial slur was directed at him and his wife because "of their boldness, which is uncommon at ESU."  *Id.* ¶ 42.  Plaintiff also believes that the graduate assistant who reported the racial slur to Ms. Hale merely served as a conduit for the message.

Plaintiff and his wife reported the racial slur to Dr. Alexander and requested that she investigate it.  Plaintiff also told SLIM's Faculty Chair, Dr. Dow, about the racial slur a few days later.  He asked Dr. Dow why "nothing apparently was being done" about it.  *Id.* ¶ 53.  Plaintiff's wife spoke with Dr. Dow after her husband's conversation.  Plaintiff's wife expressed her concerns about the incident and the manner in which ESU was addressing it.  Dr. Dow told Ms.

Hale that she was amazed that Dr. Alexander had done nothing about the incident more than a month after it had happened. Dr. Dow agreed to talk to Dr. Alexander and Human Resources about the matter.

In late June 2015, plaintiff and his wife reported the racial slur incident to Dr. David Cordle, ESU's Provost, and Judy Anderson, Director of Human Resources. Plaintiff and his wife also reported the matter to the ESU Police Department and attempted to file a police report. According to plaintiff, the ESU Police Department refused to investigate the matter. Plaintiff also called the Lyon County Attorney and left a message asking that he call him to discuss a possible hate crime at ESU. The Lyon County Attorney never returned plaintiff's phone call. According to plaintiff, the Lyon County Attorney chose not to investigate the matter and concluded that no crime had occurred after relying on information provided by ESU.

Plaintiff then wrote a letter to Dr. Jackie Vietti, ESU's Interim President, asking her to investigate the April 8, 2015 incident and reporting his belief that he and his wife were victims of retaliation. Shortly after sending the letter, Ray Lauber, a Human Resources employee of ESU, contacted the Hales. Mr. Lauber explained that he was assembling a report about the incident for Dr. Vietti. The Hales met with Mr. Lauber separately. During their conversations, they each discussed their concerns about the April 8, 2015 racial slur incident. They also reported the earlier incidents of discrimination by Ms. Rittgers to Mr. Lauber.

The Hales later learned that Mr. Lauber was a family friend of Ms. Rittgers. Plaintiff accused Mr. Lauber of bias and asked that he recuse himself from the investigation. He refused. Dr. Vietti also refused to remove Mr. Lauber from reporting the matter.

Plaintiff alleges that Dr. Alexander began to treat him and his wife differently than others in the SLIM after they reported the April 8, 2015 incident to Provost Cordle and the ESU Police

Department.  On July 7, 2015, Dr. Alexander came to the fourth floor to visit all of the faculty members on that floor.  But she refused to visit the Hales.  Afterwards, plaintiff went to Dr. Alexander's office to ask her about how things were going.  During this conversation, Dr. Alexander expressed disappointment that the Hales had reported the April 8, 2015 incident to the Provost and the ESU Police Department.  Dr. Alexander said that the Hales' performance had been stellar leading up to their complaints, but that she felt blindsided by their allegations that she and Ms. Rittgers had engaged in misconduct.  Dr. Alexander told plaintiff that she had hoped he would have overlooked the April 8, 2015 incident because he could have served as a model for professional behavior by an African-American.  Dr. Alexander also expressed frustration that the Hales wanted something done about the incident.  She told plaintiff that he should accept the incident because "this is Kansas."  *Id.* ¶ 82.

Ms. Hale was a contractual employee when she started working for the SLIM.  According to plaintiff, Dr. Alexander promised that she would make Ms. Hale a permanent employee because she was doing an excellent job.  Dr. Alexander encouraged Ms. Hale to complete her Bachelor's degree so that she could earn a higher salary and have the opportunity for promotions at ESU.  Ms. Hale enrolled in classes at ESU starting in the fall of 2015, so that she could work toward her degree.  But, after the Hales complained to the Provost and the ESU Police Department about the April 8, 2015 incident, Dr. Alexander told Ms. Hale that ESU would not renew her contract and that she would not become a permanent employee.  In response, Ms. Hale wrote an "Open Letter to Dean Alexander" about her feelings and resigned from ESU two weeks before her contract ended.  *Id.* ¶ 94.  Ms. Hale also resigned because Dr. Alexander had asked her to interact with Ms. Rittgers in what she perceived as a demeaning and subservient manner.

According to plaintiff, Ms. Hale's Open Letter "created a firestorm of controversy on the ESU campus." *Id.* ¶ 99. The Associated Press covered the story on July 29, 2015. Plaintiff continued to demand that ESU investigate the bias incident properly. Plaintiff accuses defendants Jackie Vietti (former Interim President of ESU), David Cordle (ESU Provost), Gary Wyatt (Dean of the Honors College and Assistant Provost of ESU), Judy Anderson (ESU Director of Human Resources), Kevin Johnson (ESU General Counsel), and Ray Lauber (the Human Resources employee charged with writing the report) of reporting to the media, campus, and public that ESU had conducted a fair, logical, and thorough investigation of the racial slur incident and that no crime had occurred.

On September 9, 2015, plaintiff and his attorney met with Dr. Vietti. Dr. Vietti told plaintiff that ESU had determined that no hate crime had occurred. Dr. Vietti also asked plaintiff to sign a document stating that he would seek counseling and refrain from discussing his concerns about discrimination in the SLIM. According to plaintiff, his lawyer advised him not to sign anything. His lawyer also told Dr. Vietti that signing the document would have a chilling effect to employees who report hate crimes. Also during this meeting, Dr. Vietti "introduced the subject of [plaintiff's] termination." *Id.* ¶ 131.

On September 16, 2015, ESU sent a letter to plaintiff. It stated that plaintiff must retract his allegation that Ms. Rittgers was the probable author of the racial slur or face termination. According to plaintiff, ESU intended its treatment of plaintiff to have a chilling effect on future whistleblowers trying to expose racism at ESU.

Plaintiff accuses defendants Cordle, Vietti, Johnson, Anderson, Wyatt, and Lauber of developing and extending a "Cooling Off Period" for plaintiff. *Id.* ¶ 156. The "Cooling Off Period" began in August 2015, and continued until plaintiff's termination in May 2016. Plaintiff

describes this "Cooling Off Period" as effectively banishing him from his workplace and his colleagues. He also asserts that he was prohibited from discussing racial discrimination during the "Cooling Off Period." Plaintiff also could not access his office during the "Cooling Off Period." Before the "Cooling Off Period," plaintiff had received excellent student and professional evaluations at ESU.

Plaintiff's inability to access his office prevented him from creating a portfolio of his research and service contributions. ESU then used plaintiff's failure to create the portfolio as a reason for his termination. Plaintiff accuses ESU of terminating his employment unlawfully because he complained about racial discrimination and retaliation. He also accuses ESU and some of the individual defendants of ignoring his complaints about racial discrimination and failing to investigate his complaints properly. Also, plaintiff alleges that the individual defendants subjected him to extreme hostility and negative publicity. And, plaintiff accuses the individual defendants of retaliating against him for exercising his right to speak out against discrimination.

Plaintiff filed administrative charges of discrimination with the Department of Justice and received right to sue letters. *Id.* ¶ 5. On December 8, 2016, plaintiff filed his Complaint in this case. Doc. 1. Plaintiff describes this case as a "refiling of Case No. 15-CV-4947-SAC-KGS . . . which was voluntarily dismissed without prejudice upon the condition 'that all pleadings, discovery, testimony, orders or rulings, or any other substantive matters from this case, will be binding in any later filed action of the same claims so as not to prejudice either party to this action, with costs to be borne by the party incurring it.'" *Id.* ¶ 1 (quoting *Hale v. Emporia State Univ.*, No. 15-4947-SAC-KGS (D. Kan. Sept. 30, 2016), ECF No. 93 at 6).

## II.     Rule 12(c) Motion for Judgment on the Pleadings Standard

A party may move for judgment on the pleadings under Fed. R. Civ. P. 12(c) after the

pleadings are closed but early enough not to delay trial.  Fed. R. Civ. P. 12(c).  Courts evaluate a

Rule 12(c) motion under the same standard that governs a Rule 12(b)(6) motion to dismiss.

*Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 n.2 (10th Cir. 2002).

The court will grant a motion for judgment on the pleadings only when the factual

allegations in the complaint fail to "state a claim to relief that is plausible on its face," *Bell Atl.*

*Corp. v. Twombly*, 550 U.S. 544, 570 (2007), or when an issue of law is dispositive, *Neitzke v.*

*Williams*, 490 U.S. 319, 326 (1989).  "A claim has facial plausibility when the plaintiff pleads

factual content that allows the court to draw the reasonable inference that the defendant is liable

for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550

U.S. at 556).  "Under this standard, 'the complaint must give the court reason to believe that *this*

plaintiff has a reasonable likelihood of mustering factual support for *these* claims.'"  *Carter v.*

*United States*, 667 F. Supp. 2d 1259, 1262 (D. Kan. 2009) (quoting *Ridge at Red Hawk, L.L.C. v.*

*Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007)).

Although the court must assume that the factual allegations in the complaint are true, it is

"not bound to accept as true a legal conclusion couched as a factual allegation."  *Id.* at 1263

(quoting *Iqbal*, 556 U.S. at 678).  "Threadbare recitals of the elements of a cause of action,

supported by mere conclusory statements, do not suffice" to state a claim for relief.  *Bixler v.*

*Foster*, 596 F.3d 751, 756 (10th Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678).

### III.    Analysis

Defendants assert that plaintiff's Complaint fails to state a claim sufficient to survive a motion for judgment on the pleadings under Rule 12(c). The court addresses plaintiff's two claims separately, below.

### A.  Plaintiff's Title VII Claim Against ESU

Defendants assert that plaintiff's Title VII claim is time-barred. Title VII requires a plaintiff to file a civil action within 90 days of receiving a right to sue letter. 42 U.S.C. § 2000e-5(f)(1); *Croy v. Cobe Labs., Inc.*, 345 F.3d 1199, 1202 (10th Cir. 2003); *Scott v. Boeing Co.*, 48 F. App'x 730, 731 (10th Cir. 2002). Here, plaintiff's Complaint alleges that he received right to sue letters, but never identifies the dates he received them. Doc. 1 ¶ 5. Plaintiff, however, attached the right to sue letters to his Complaint in another case that he filed in our court.[1]

Plaintiff filed a Complaint in Case No. 15-4947 on October 14, 2015. *Hale v. Emporia State Univ.*, No. 15-4947-SAC-KGS (D. Kan. Oct. 14, 2016), ECF No. 1. He submitted two right to sue letters with his Third Amended Complaint in that case. *Id.*, ECF No. 20-1. The Department of Justice issued the first right to sue letter on January 21, 2016, and the second right to sue letter on March 18, 2016. *Id.*, ECF No. 20-1 at 2, 4. Plaintiff received these letters no later than March 23, 2016—the date when he filed them in Case No. 15-4947. On September 16, 2016, plaintiff moved to dismiss Case No. 15-4947 voluntarily and without prejudice. *Id.*, ECF No. 89. Judge Crow granted plaintiff's motion and dismissed the case without prejudice on September 30, 2016. *Id.*, ECF No. 93.

---

[1]    The court takes judicial notice of the filings in Case No. 15-4947, including the right to sue letters. *See Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) (explaining that a court may "take judicial notice of its own files and records" on a motion to dismiss under Rule 12(b)(6) without converting the motion to dismiss into a motion for summary judgment (citations and internal quotation marks omitted)).

Plaintiff then filed this case some two months later on December 8, 2016 (Doc. 1), more than 90 days after he received the two right to sue letters. Plaintiff's Complaint concedes that he voluntarily dismissed Case No. 15-4947 without prejudice. Doc. 1 ¶ 1. And, plaintiff's Complaint characterizes this lawsuit as a "re-filing" of Case No. 15-4947. *Id.* But, "the filing of a complaint that is dismissed without prejudice does not toll the statutory filing period of Title VII." *Brown v. Hartshorne Pub. Sch. Dist. No. 1*, 926 F.2d 959, 961 (10th Cir. 1991), *abrogated on other grounds by Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). Instead, a voluntary dismissal without prejudice generally "leaves the parties as though the action had never been brought." *Id.* (citations omitted). The statute of limitations thus bars plaintiff's re-filed Title VII claim here because he did not file his claim within 90 days of receiving the right to sue letters. *See id.* (affirming dismissal of a plaintiff's re-filed Title VII claim as time-barred); *Brown v. Kempthorne*, 190 F. App'x 590, 591 (10th Cir. 2006) (affirming dismissal of a pro se plaintiff's re-filed Title VII complaint because it "was clearly not filed within 90 days of her receipt of the final agency decision" and thus "the statute of limitations barred" plaintiff's claim); *Scott*, 48 F. App'x at 731 (same).

Plaintiff argues that equitable tolling should save his Title VII claim here. He explains that defendants' actions have caused him to lose income which, in turn, created physical stress and illness requiring medical treatment. Plaintiff asserts that his health condition prevented him from litigating Case No. 15-4947. So, he asked the court for a voluntary dismissal of that case. Plaintiff contends that these circumstances permit the court to apply equitable tolling to his Title VII claim here. The court disagrees.

The Tenth Circuit has recognized that equitable tolling can apply to Title VII's statute of limitations, but it reserves the doctrine for a narrow band of circumstances. It applies "only if

the circumstances of the case rise to the level of active deception which might invoke the powers of equity to toll the limitations period." *Biester v. Midwest Health Servs., Inc.*, 77 F.3d 1264, 1267 (10th Cir. 1996) (citations and internal quotation marks omitted). The Circuit has noted that equitable tolling may apply "where a plaintiff has been lulled into inaction by [his] past employer, state or federal agencies, or the courts" or if the plaintiff is "actively misled" or "in some extraordinary way [has] been prevented from asserting his or her rights." *Id.* (citation and internal quotation marks omitted). The Circuit also has acknowledged the possibility of applying equitable tolling when the plaintiff has suffered a mental incapacity, but "exceptional circumstances" must exist for even that exception to apply. *Id.* And, so far, the Circuit never has applied this exception in any case. *Del Rantz v. Hartley*, 577 F. App'x 805, 810 (10th Cir. 2014) (citations omitted).

Plaintiff has not alleged facts sufficient to permit use of equitable tolling here. No one actively misled him or prevented him from asserting his rights. Plaintiff chose to dismiss Case No. 15-4947 voluntarily, after the statute of limitations had run on his Title VII claim. Although plaintiff proceeds pro se, the court cannot change the consequences of plaintiff's decision to dismiss his earlier case voluntarily. *See Montoya v. Chao*, 296 F.3d 952, 958 (10th Cir. 2002) (holding that difficulties faced by many litigants such as "limited education and little understanding of the law or of the intricacies of the procedural framework of Title VII actions" do not suffice to justify equitable tolling); *see also Brown*, 190 F. App'x at 591 (affirming dismissal of a pro se plaintiff's Title VII claim and refusing to apply equitable tolling because "no evidence . . . support[ed] her assertion that she was misled to believe her case would be timely if re-filed within one year"); *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840

(10th Cir. 2005) (explaining that pro se litigants must comply with procedural rules that govern other litigants).

Finally, the Kansas savings statute, Kan. Stat. Ann. § 60-518, cannot save plaintiff's Title VII claim from the statute of limitations. A state's savings statute does not apply to Title VII claims. *See Brown*, 926 F.2d at 961 (explaining that the Oklahoma savings statute did not apply to plaintiff's Title VII claim); *see also Cady v. Golden Arch of Kan., Inc.*, No. 02-2601-KHV, 2003 WL 21241422, at *2 (D. Kan. May 27, 2003) (dismissing plaintiff's Title VII claim as untimely and refusing to apply the Kansas savings statute to revive the claim because "state tolling and savings provisions do not apply where Congress has provided a federal statute of limitation for a federal claim"); *Smith v. First Am. Inv. Grp., Inc.*, No. 89-2209-S, 1990 WL 81032, at *1 (D. Kan. May 8, 1990) (same). The court thus dismisses plaintiff's Title VII claim because the statute of limitations bars it from going forward.

## B. Plaintiff's § 1983 Claim Against the Individual Defendants

Defendants assert that three arguments support dismissal of plaintiff's § 1983 retaliation claim against the seven individual defendants. First, defendants argue that plaintiff's Complaint fails to state a claim under § 1983 because his alleged speech is not a matter of public concern entitled to First Amendment protection. Second, defendants assert that even if plaintiff's speech is a matter of public concern, the individual defendants are entitled to qualified immunity against plaintiff's § 1983 claim. Finally, defendants contend that Eleventh Amendment immunity bars plaintiff's official capacity claims against the seven individual defendants. The court addresses each argument, in turn, below.

### 1. Does plaintiff's Complaint allege protected speech that is a matter of public concern?

The Supreme Court has held that "a public employee does not relinquish First Amendment rights to comment on matters of public interest by virtue of government employment." *Connick v. Myers*, 461 U.S. 138, 140 (1983) (citing *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968)). But, at the same time, the Supreme Court recognizes that "[w]hen a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom" because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006) (citations omitted). The Supreme Court thus instructs courts to balance carefully the competing "interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Helget v. City of Hays, Kan.*, 844 F.3d 1216, 1221 (10th Cir. 2017) (quoting *Lane v. Franks*, 134 S. Ct. 2369, 2374 (2014) (further quotation omitted)).

To balance those competing interests carefully, the court applies the five step *Garcetti/Pickering* test to determine whether plaintiff has stated a First Amendment retaliation claim. *Id.* The five steps are:

(1) whether the speech was made pursuant to an employee's official duties; (2) whether the speech was on a matter of public concern; (3) whether the government's interests, as employer, in promoting the efficiency of the public service are sufficient to outweigh the plaintiff's free speech interests; (4) whether the protected speech was a motivating factor in the adverse employment action; and (5) whether the defendant would have reached the same employment decision in the absence of the protected conduct.

*Id.* at 1221–22 (quoting *Trant v. Oklahoma*, 754 F.3d 1158, 1165 (10th Cir. 2014) (further quotation omitted)).  The first three steps are questions of law for the court to decide.  *Id.* (citation omitted). The last two steps are questions of fact.  *Id.* (citation omitted).

Defendants argue that plaintiff fails to allege facts to support the second step of this test—that plaintiff's speech involved a matter of public concern.  This step requires the employee to allege that his speech "involves a matter of public concern and not merely a personal issue internal to the workplace."  *Moore v. City of Wynnewood*, 57 F.3d 924, 931 (10th Cir. 1995) (citing *Connick*, 461 U.S. at 146–47; *see also Morris v. City of Colo. Springs*, 666 F.3d 654, 661 (10th Cir. 2012) ("[S]peech relating to internal personnel disputes and working conditions ordinarily will not be viewed as addressing matters of public concern." (citation and internal quotation marks omitted)).  In other words, "speech that simply airs 'grievances of a purely personal nature' typically does not involve matters of public concern."  *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1205 (10th Cir. 2007) (quoting *Connick*, 461 U.S. at 147–48).

Speech is a matter of public concern "when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."  *Lane*, 134 S. Ct. at 2380 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).  "The inquiry turns on the 'content, form, and context' of the speech."  *Id.* (quoting *Connick*, 461 U.S. at 147–148).  In *Connick v. Myers*, the Supreme Court stated that "racial discrimination" is "a matter inherently of public concern." 461 U.S. at 148 n.8; *see also Quigley v. Rosenthal*, 327 F.3d 1044, 1060 (10th Cir. 2003) (explaining that *Connick* stated that "'racial discrimination,' at least in the

context of public-employment, is 'a matter inherently of public concern.'" (quoting *Connick*, 461 U.S. at 148 n.8)).

Plaintiff alleges that the individual defendants violated his First Amendment free speech rights when they placed him in a "Cooling Off Period" beginning in August 2015. Defendants assert that plaintiff never alleges that his speech involved a matter of public concern before the implementation of the "Cooling Off Period." Instead, defendants contend that plaintiff's speech was internal in scope and personal in nature. Defendants also assert that this court is not the appropriate forum to review the wisdom of a personnel decision taken by a public agency in response to an employee's behavior. Defendants' assertions might provide a basis to rule for them on a summary judgment motion. And they might not. But here, the court must decide the case on the facts as plaintiff has alleged them. Plaintiff's Complaint alleges facts sufficient to state a § 1983 claim against the individual defendants. It thus survives defendants' motion for judgment on the pleadings.

Construing the Complaint's allegations liberally and viewing them in the light most favorable to plaintiff, it appears that plaintiff's speech addressed both his personal grievances and a purported culture at ESU that allegedly discriminates against African-Americans. For example, the Complaint alleges that "ESU fosters a white-dominated culture that does not appear to feel the need to diversify, starting from the top down." Doc. 1 ¶ 43. The Complaint also alleges that plaintiff and his wife's complaints "represented a threat to the racial lens at the SLIM." *Id.* ¶ 37; *see also id.* ¶ 153 (stating that defendants' actions were intended to have "a chilling effect on future whistle-blowers inclined to expose racism at ESU"); *id.* ¶ 162 (characterizing plaintiff's complaints as a "protest against racism").

Plaintiff's Complaint also asserts that the individual defendants ignored and "turned a deaf ear" to the Hales' complaints about racial discrimination and retaliation for reporting the same. *Id.* ¶¶ 97, 106. And, it asserts that the Hales attempted to report the racial slur incident as a hate crime with the ESU Police Department but that the ESU Police Department Chief refused to investigate the matter and concluded that no crime had occurred. *Id.* ¶¶ 59, 61. The Complaint also accuses the individual defendants of retaliating against him because he exercised his right to speak out against discrimination and racism. *Id.* ¶ 236. And, the Complaint alleges that ESU prevented him from speaking about an upcoming march against racism. *Id.* ¶ 206.

Construing these allegations liberally and in the light most favorable to plaintiff, the Complaint alleges that plaintiff's complaints about racial discrimination involved both personal complaints and speech about a matter of public concern. At this stage, plaintiff's Complaint need only assert facts that, accepted as true, allege plaintiff's speech addressed a matter of public concern. Plaintiff has satisfied this pleading standard sufficient to survive defendants' motion.

### 2. Are defendants entitled to qualified immunity?

"Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'" *Lane*, 134 S. Ct. at 2381 (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 743 (2011)). This doctrine "protects 'all but the plainly incompetent or those who knowingly violate the law.'" *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Qualified immunity shields a government official from a money damages award in his or her personal capacity "unless 'the official violated a statutory or constitutional right,' and 'the right was "clearly established" at the time of the challenged conduct.'" *Lane*, 134 S. Ct. at 2381 (quoting *al-Kidd*, 563 U.S. at 735). So, on a motion to dismiss based on qualified immunity, a court must consider, first, "whether the facts that a plaintiff has alleged . . . make out a violation of a constitutional right," and second "whether the right at issue was clearly

established at the time of defendant's alleged misconduct." *Leverington v. City of Colo. Springs*, 643 F.3d 719, 732 (10th Cir. 2011) (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). The Supreme Court has held that courts have discretion to decide "which of the two prongs of the qualified immunity analysis" to address "first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236.

"Although qualified immunity defenses are typically resolved at the summary judgment stage, district courts may grant motions to dismiss on the basis of qualified immunity." *Thomas v. Kaven*, 765 F.3d 1183, 1194 (10th Cir. 2014). Asserting a qualified immunity defense in a Rule 12(b)(6) motion, however, "subjects the defendant to a more challenging standard of review than would apply on summary judgment." *Id.* (quoting *Peterson v. Jensen*, 371 F.3d 1199, 1201 (10th Cir. 2004)). This is so because at the motion to dismiss stage, the court scrutinizes defendants' conduct as alleged in the complaint for "objective legal reasonableness." *Behrens v. Pelletier*, 516 U.S. 299, 309 (1996). But, on summary judgment, the plaintiff no longer can rest on the pleadings, and the court considers the evidence in the summary judgment record when conducting the qualified immunity inquiry. *Id.*

Here, the Complaint alleges facts, if proven true, that suffice to establish the individual defendants violated a clearly established constitutional right. The Complaint alleges that the individual defendants placed plaintiff on a "Cooling Off Period" and terminated his employment in retaliation for exercising his First Amendment rights to speak out against discrimination and racism. As explained above, Supreme Court precedent clearly establishes that "a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick*, 461 U.S. at 142; *see also Lane*, 134 S. Ct. at 2377 ("[P]ublic employees do not renounce their citizenship when they accept employment, and this

Court has cautioned time and again that public employers may not condition employment on the relinquishment of constitutional rights." (citations omitted)). Indeed, the Supreme Court has found it "essential that public employees be able to speak out freely [on matters of public concern] without fear of retaliat[ion]." *Connick*, 461 U.S. at 149; *see also Lane*, 134 S. Ct. at 2377 ("Speech by citizens on matters of public concern lies at the heart of the First Amendment," and "[t]his remains true when speech concerns information related to or learned through public employment.").

The court thus concludes that plaintiff's Complaint alleges that the individual defendants violated a clearly established constitutional right when they placed him on a "Cooling Off Period" and terminated his employment to retaliate for exercising his First Amendment rights. Plaintiff's Complaint sufficiently alleges facts to support this claim. So, defendants are not entitled to qualified immunity at this stage in the proceedings.

### 3. Does Eleventh Amendment immunity bar plaintiff's official capacity claims?

Finally, defendants assert that the Eleventh Amendment bars plaintiff's official capacity claims against the individual defendants. The Eleventh Amendment generally bars suits against states and their agencies based on their sovereign immunity. *Levy v. Kan. Dep't of Soc. & Rehab. Servs.*, 789 F.3d 1164, 1168 (10th Cir. 2015) (quoting *Bd. of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 363 (2001) ("The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court.")). But, three exceptions to Eleventh Amendment immunity exist:

> First, a state may consent to suit in federal court. Second, Congress may abrogate a state's sovereign immunity by appropriate legislation when it acts under Section 5 of the Fourteenth Amendment. Finally, under *Ex parte Young*, 209 U.S. 123, 28 S. Ct. 441, 52 L.Ed. 714 (1908), a plaintiff may bring suit against individual state officers acting in their official capacities if the complaint alleges an ongoing violation of federal law and the plaintiff seeks prospective relief.

*Id.* (quoting *Muscogee (Creek) Nation v. Pruitt*, 669 F.3d 1159, 1166 (10th Cir. 2012)).

Here, defendants assert that the Eleventh Amendment bars plaintiff's official capacity claims against the individual defendants (who all are state officials) because the State never has consented to suit under § 1983, Congress never has abrogated the states' sovereign immunity from those suits, and plaintiff's Complaint just seeks retroactive money damages as relief. The court agrees. *See Ellis v. Univ. of Kan. Med. Ctr.*, 163 F.3d 1186, 1196 & n.13 (10th Cir. 1998) (explaining that the Eleventh Amendment barred plaintiffs' §§ 1981, 1983, and 1985 claims for money damages against state officials in their official capacities); *see also Hale v. Emporia State Univ.*, No. 15-4947-SAC-KGS, 2016 WL 917896, at *3 (D. Kan. Mar. 8, 2016) (holding that the Eleventh Amendment barred plaintiff's § 1983 claims for money damages against ESU and the individual defendants in their official capacities).

Plaintiff's Opposition to defendants' motion asserts that his claims fall within the *Ex Parte Young* exception to the Eleventh Amendment's guarantee of sovereign immunity. Doc. 23 at 24. *Ex Parte Young* held that "the Eleventh Amendment generally will not operate to bar suits so long as they (i) seek only declaratory and injunctive relief rather than monetary damages for alleged violations of federal law, and (ii) are aimed against state officers acting in their official capacities, rather than against the State itself." *Hill v. Kemp*, 478 F.3d 1236, 1255–56 (10th Cir. 2007) (citing *Ex Parte Young*, 209 U.S. at 159–60). But, plaintiff concedes that his Complaint never requests the requisite declaratory or injunctive relief, as the *Ex Parte Young* exception demands. Plaintiff's Opposition provides "preliminary proposals" of injunctive relief but contends "that the specific mode of any injunctive relief should be deferred until after discovery." Doc. 23 at 25. And, importantly, plaintiff's Complaint never asks for prospective injunctive relief that would allow him to assert his official capacity claims against the individual

defendants consistent with *Ex Parte Young*. Thus, the *Ex Parte Young* exception does not apply here.

To the extent plaintiff seeks to amend his Complaint to include a request for injunctive relief, he may file the appropriate motion under Fed. R. Civ. P. 15 and D. Kan. Rule 15.1. The court cautions, however, that any requested injunctive relief must seek prospective relief that the named individual defendants have the power to perform. *See Klein v. Univ. of Kan. Med. Ctr.*, 975 F. Supp. 1408, 1417 (D. Kan. 1997) (explaining that a federal court may grant prospective injunctive relief against a state official acting in his or her official capacity but "the state official must have the power to perform the act required in order to overcome the jurisdictional bar of the Eleventh Amendment" (citing *Ex Parte Young*, 209 U.S. at 157)).

Many of plaintiff's "preliminary proposals" for injunctive relief seek retroactive relief. *See* Doc. 23 ¶ A (seeking an order that "Defendants engage[d] in conduct subject to penalty under 42 U.S.C. § 1983 and Title VII"), ¶ B (seeking an order that "Defendants engaged in a sham investigation and a cover-up involving allegations of a bias incident at ESU" and requiring defendants to "retract their claim that at fair, logical and thorough investigation was done"), ¶ D (seeking an order requiring the ESU Bulletin (a student newspaper) to retract "false statements attributed to [plaintiff], and admit to publishing false narratives and allegations against [plaintiff]"), ¶ E (seeking an order requiring defendants " to contact all media entities previously contacted by them to inform them that their 'investigation' into the allegations made by [plaintiff] was biased and falsified to make it appear that ESU was discrimination and hate-free"). Also, many of plaintiff's "preliminary proposals" seek relief that the named individual defendants lack the power to implement. *See id.* ¶ C (seeking an order requiring Ms. Rittgers (who is not a defendant in the case) "to submit to a forensic handwriting examination and

polygraph test to determine whether she wrote the racial epithet"), ¶ D (seeking an order requiring the ESU Bulletin (not a defendant in this case) to retract statements). Plaintiff cannot assert such claims and avoid application of the Eleventh Amendment immunity bar.

Thus, if plaintiff seeks leave to amend his Complaint to request injunctive relief of this kind, the request would be futile because the *Ex Parte Young* exception does not exempt these claims from the Eleventh Amendment's sovereign immunity bar. *See Foman v. Davis*, 371 U.S. 178, 182 (1962) (explaining that a court may deny leave to amend based on the futility of the proposed amendment).

**IV.     Conclusion**

For the reasons explained above, the court grants in part and denies in part defendants' Motion for Judgment on the Pleadings. The court grants defendants' motion against plaintiff's Title VII claims and his official capacity claims against the individual defendants. The court denies the motion to the extent it seeks dismissal of plaintiff's § 1983 claim against the individual defendants in their individual capacities.

**IT IS THEREFORE ORDERED BY THE COURT THAT** defendants' Motion for Judgment on the Pleadings (Doc. 21) is granted in part and denied in part.

**IT IS SO ORDERED.**

Dated this 14th day of July, 2017, at Topeka, Kansas.

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**